UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                         CASE NO. 6:14-cr-96-Orl-22GJK

ASHLEY NICOLE BARNETT

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant United States Attorney, files its sentencing memorandum and requests this Court to impose a sentence within the Sentencing Guidelines ("guidelines") range as set forth in the Presentence Report (PSR) prepared by the United States Probation Office.   A guidelines sentence in this case will achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a) because it will reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect children from further crimes of the defendant.

## BACKGROUND

Ashley Nicole Barnett (Barnett), also known as "Snow," was a 23-year-old with a history of drug abuse, alcohol abuse and petty criminal conduct.   PSR at ¶¶ 47-50, 74.   Barnett was living a "nomadic lifestyle," drifting from place to place and barely able to hold a job.   After losing custody of her daughters in Tennessee, Barnett relocated to Florida, where she continued her destructive and criminal lifestyle as a prostitute.   PSR at ¶¶ 65-71, 77-82.

In December 2012, G.E. met Barnett at a friend's house.   Doc. 157 at 4.

G.E. was a vulnerable 14-year-old middle school student who suffered from bi-polar and anxiety disorder, and who had tried to kill herself several times. Doc. 157 at 3-4.   Barnett knew that G.E. was a frequent runaway and truant; Barnett saw G.E. almost every day and she provided her with food and clothes. Doc. 157 at 4; Doc. 158 at 5-6.   Barnett also knew G.E.'s age, but nevertheless gave her drugs and alcohol, taught her how to "talk game" with men, and arranged for G.E. to meet men at hotels to have sex in exchange for drugs, alcohol and money.   Doc. 157 at 7-9, 24, 48-49.   Barnett even gave G.E. her first molly, a drug similar to MDMA.   Doc. 157 at 7.   Barnett manipulated G.E. into believing that she cared for her as a sister or a mother.   Indeed, Barnett told G.E. to call her "mommy," and G.E. testified that she trusted and admired Barnett, and viewed her as a mother or sister.   Doc. 157 at 9; see *also,* Doc. 158 at 95-96.   G.E. believed that when Barnett took her to hotels, they were "partying;" she did not understand that Barnett was grooming her for prostitution.   Doc. 157 at 73-74.

On January 17, 2013, one day after G.E. was released from a mental health treatment facility, G.E. ran away from her home and met Barnett.   Doc. 157 at 11.   Barnett told G.E. that she had some guys to meet and took G.E. to an apartment building.   *Id.*   There, G.E. met "Billy" and defendant Jose Carmona (Carmona), and together they drove her to a house known as "the studio," a gang house where members of an east coast Blood gang called the Nine Trey Gangstas, or Billy Bad Ass, stored firearms, and sold and used drugs.   *Id.* at 12;

Doc. 158 at 75-76, 82.   Defendant Xavier Francisco Villanueva (Villanueva), known as "X" or "Chaos" was the leader of the gang and "controlled pretty much everything."   Doc. 158 at 78.   Villanueva had a history of violent criminal conduct and as the gang leader, he required gang members to give the profits of their illegal activities to him. If gang members did not follow his orders, he would "beat [them] down."   *Id.* at 78-79.

Carmona, also known as "Hood," was a 19-year-old with a history of drug abuse and criminal conduct.   Carmona PSR at ¶¶ 49-51, 71-72.   He also was a gang member who lived at the studio.   G.E. testified that she developed a crush on Carmona, and Barnett was aware of her feelings.   Doc. 158 at 16.

When she arrived at the studio, G.E. also met defendant Keith E. Romby, II (Romby).   Romby was a 21-year-old member of the gang who lived at the studio. Doc. 158 at 74.   Villanueva initiated Romby into the gang by requiring him to fight another gang member.   *Id.* at 79.

Romby was also a pimp.   *Id.* at 70.   Shortly after they arrived at the studio, Barnett told Romby that G.E. was her "bitch," and offered her to Romby for prostitution.   *Id.* at 86-89.   Romby, Barnett and Carmona gave G.E. marijuana, molly and alcohol, including Fourloco, an alcohol energy drink.   Doc. 157 at 13; Doc. 158 at 87.   Romby explained that he gave G.E. molly in order to control her, because molly was a stimulant and was addicting.   Doc. 158 at 76-77.   At some point, Romby, Barnett and Carmona took G.E. into a bedroom and took pictures of her to post on internet "escort" websites.   Doc. 157 at 14-16; Doc. 158 at 89.

While Carmona walked in and out of the bedroom, Barnett and Romby directed G.E. to remove her pants and shirt, cover her face and pose in seductive, sexual positions on the bed.   Doc. 157 at 14-15; Doc. 158 at 89-90.   Barnett climbed on the bed with G.E. and showed her how to pose.   Doc. 158 at 90.   According to Romby, G.E. "really didn't know what was going on and she didn't really understand what she needed to be doing."   Doc. 157 at 89.   Romby used his cell phone to take pictures of G.E.   Doc. 157 at 15; Doc. 158 at 90.   Barnett and Romby created a profile for G.E. on the internet escort site, myredbook.   Doc. 158 at 90-91.   Barnett wrote the profile, and Romby posted the pictures he took of G.E. and provided his phone number as a contact number for potential customers.   *Id.* at 91-93.   Romby also transferred the pictures to a computer at the studio.   *Id.* at 90; *See* Gov. Exs. 30, 30A.   Later, G.E. "use[] those pictures to kind of attract tricks when they asked."   Doc. 157 at 16.

After they created the internet page advertising G.E. for sex, Romby, Barnett and Carmona took G.E. to the Knights Inn to engage her in prostitution. *Id.* at 16-17; Doc. 158 at 94-97.   G.E. was very high on molly.   Doc. 158 at 96, 103.   Romby paid for two rooms, and both Romby and Barnett provided their driver's licenses to the hotel clerk to rent the rooms.   Doc. 157 at 17; Doc. 158 at 98-99.   At the hotel, Romby and Carmona gave G.E. cocaine, marijuana and alcohol. Doc. 158 at 100.   They also each had sex with G.E. in order to "turn her out" for prostitution, and to show her that they were in charge.   Doc. 157 at 18; Doc. 158 at 99.

At some point during the early morning, Romby and Carmona told G.E. that she needed to pay them back for the drugs they gave her through prostitution.   Doc. 157 at 19; Doc 158 at 101.   G.E. had never engaged in prostitution, and Romby knew that she was inexperienced.   Doc. 158 at 100. Romby and Carmona told G.E. where to walk, what to charge, how to act and how to detect law enforcement.   Doc. 157 at 22; Doc. 158 at 100-101.   For example, Romby told G.E. to walk on the side of the road of oncoming traffic and to keep the car door ajar, if possible.   Doc. 158 at 100.   He told her to charge $50 for oral sex and $100 for vaginal sex.   *Id.* at 102-103.   In the early morning, at about 4:00 a.m., Romby and Carmona watched as G.E. walked on Orange Blossom Trail in search of prostitution customers.   *Id.* at 104-05.   They did not give G.E. a phone or condoms.   *Id.* at 102.   G.E. had sex with a man in exchange for twenty dollars and gave the money to Romby and Carmona, who praised her for a job well done.   Doc. 157 at 21-22; Doc. 158 at 104-05.   Romby and Carmona split the proceeds.   Doc. 158 at 105.

Later that morning, Romby and Carmona took G.E. back to the "studio." Throughout that day, Romby prostituted G.E.   Romby created another profile for G.E. on the internet site, datehookup.   Doc. 158 at 109.   He taught G.E. how to talk to customers, and directed her to talk to men on his phone who had responded to her internet advertisements on myredbook and datehookup.   Doc. 157 at 24-25; Doc. 158 at 109-110, 120.   Romby and G.E. spent the day on the

internet "looking for local men who are online, talking to them, trying to lure them into purchasing sexual activity from G.E."   Doc. 158 at 109.   Romby negotiated the price with the customers, took G.E. to the parking lot in the vicinity of a Twisty Treat to meet the men for sex, and received the money.   Doc. 157 at 25; Doc. 158 at 112.   He also kept her high on molly, and both Romby and Carmona required her to engage in prostitution to receive more molly.   Doc. 157 at 26. Romby explained that they gave G.E. molly in order to manipulate and control her for prostitution.   Doc. 158 at 116.   G.E. used the computer at the studio and Romby's phone to send the pictures that Barnett and Romby had taken of her to customers.   Doc. 157 at 39.

The next day, G.E. left the studio and returned home.   When she checked her Facebook page, G.E. found that Carmona had sent her a message to call him. *Id.* at 44; Gov. Ex. 11.   Carmona, whom G.E. liked, convinced G.E. to return to the studio.   *Id.* at 46.   Carmona, Romby and the owner of the studio picked her up and drove her to the studio, where she started "working" again.   *Id.* at 47. Romby kept her high on molly.   Later that day, G.E. met defendant Villanueva at the studio for the first time.   *Id.* at 49.   At Romby's direction, G.E. provided a sexual "favor," to Villanueva.   *Id.* at 49-50; Doc. 158 at 113.

Throughout that day, G.E. "got some tricks.   I did the favor, got some more tricks… ."   Doc. 157 at 52.   G.E. described that during the day, gang members were present at the studio and they verbally abused her, required her to clean, refused to allow her to sleep on the bed, called her "hoe," and taunted her

6

for not making enough money.   *Id.* at 51-52; Doc. 158 at 116-17.   Later that night, G.E. left with Barnett and returned home.   Doc. 157 at 52.

At some point, Villanueva told Romby that he wanted to prostitute G.E. and Romby agreed.   Doc. 158 at 113-114.   Romby showed Villanueva the internet sites where he posted advertisements of G.E.   Villanueva also used his cell phone.   *Id.* at 114-15, 120.   Specifically, Romby showed Villanueva the datehookup profile, and told him that he received a lot of calls from the site.   *Id.* at 115.   Romby told Villanueva all that he had done with G.E.   *Id.*

The next day, Barnett called G.E. and persuaded her to return to the studio.   Doc. 157 at 52-53.   Barnett knew that G.E. was being prostituted at the studio, and she also knew that G.E. had a crush on Carmona.   *Id.* at 53. Barnett told G.E. that Carmona wanted to see her, that the gang members would not be mean to her and that "things were going to be different."   *Id.* at 52.   G.E. agreed to go back to the studio to see Carmona.   *Id.* at 53.   However, Barnett, Romby and another man drove G.E. to a different house called "Valencia" to meet Villanueva.   *Id.* at 53-54; Doc. 158 at 36.   Like the studio, the Trey Nine gang members also hung out at Valencia.   Villanueva was at Valencia when G.E. arrived, and he made it clear to her that he was now her pimp.   Villanueva gave G.E. molly and alcohol, and had sex with her.   *Id.* at 54.   He told G.E. to call him "daddy" and directed her to have sex with the owner of Valencia so that they could stay at the house.   *Id.* at 55.   According to G.E., "from then on it was favors and business."   *Id.*

During approximately the next seven days, Villanueva forced G.E. to prostitute herself to earn money for the gang. *Id.* at 55-65. Villanueva controlled all of G.E.'s prostitution activities. He drove her to Goldenrod road to meet customers and at times, walked with her and acted like her boyfriend if police were in the vicinity. *Id.* at 56. In addition, he took her to the studio in order to obtain customers off the internet because, unlike Valencia, the studio had Wi-Fi. *Id.* at 57-58. Villanueva negotiated the prices for G.E.'s prostitution activities; a customer had to pay $100 for vaginal sex and $60 for oral sex. *Id.* G.E. estimated that she earned a couple hundred dollars and gave all of the money to Villanueva. *Id.* at 56-57.

Villanueva also forced G.E. to engage in commercial sex acts, or "favors, with gang members, passing her around like a piece of property. *Id.* at 59-61. G.E. became addicted to molly. She stated that she felt aroused and beautiful on molly and that she could not sleep or eat when she took it. *Id.* at 56. Romby explained that this was by design; molly was his drug of choice for prostitutes because it facilitated their ability to "work." Doc. 158 at 116.

G.E. did not have a cellular phone, and she did not have any clothes. She only had an iPod, her lip gloss and eyeliner. Doc. 157 at 58. G.E. did not know where she was or how to return home, and she was terrified. *Id.* at 61, 64. When Villanueva left Valencia, he forced G.E. to remain in the bathroom to prevent her from leaving. *Id.* at 58-59. Three girls held her hostage in the bathroom, and one of them had a gun. *Id.* at 59-60. G.E. tried to escape

through the bathroom window, but she could not fit through it.   *Id.* at 61.   When Villanueva returned, he forced G.E. to engage in commercial sex acts with gang members and customers.   *Id.* at 60-61.

On Friday, January 25, 2013, G.E. was at the studio with Villanueva, Romby, Carmona and others.   *Id.* at 64.   The gang members planned to spend the day prostituting G.E.   *Id.* at 64; Doc. 158 at 118-19.   According to G.E., "[t]hat was supposed to be the big Friday, [I was] supposed to pull a lot of tricks that day."   Doc. 157 at 64.   The night before, some girls whom G.E. described as "strippers," gave her tights and a pink tank top to wear and allowed her to take a shower.   *Id.* at 65.   She was then transported to Valencia, where she was directed to clean the couches.   *Id.*   G.E., who had not been provided any condoms, was scared that she was pregnant, and begged Villanueva to take her home so that she could see a doctor.   *Id.* at 66.   She promised to return. Villanueva and other gang members became verbally abusive and refused to give her a ride or allow her to use a phone.   *Id.*   They shoved her out the door, and threatened to call the police.   G.E. ran, and saw that Villanueva and others were following her and threatening her.   *Id.* at 67.   G.E. ran to a family who was moving into a house in the neighborhood and they called the police, who recovered G.E. and returned her to her grandmother.   G.E. testified that she suffers from depression and post-traumatic stress disorder as a result of her ordeal.   *Id.* at 56-57.

On September 5, 2014, the jury found Barnett guilty of sex trafficking of a minor and conspiracy to engage in sex trafficking of a minor.   Doc. 147.   She faces a statutory sentence of a mandatory minimum of ten years imprisonment and a maximum of life imprisonment for the sex trafficking conviction and a maximum term of life imprisonment for the conspiracy conviction.   Pursuant to the PSR, Barnett's guidelines range is 360 months to life imprisonment.   For the reasons set forth below, the United States requests a sentence of imprisonment within the sentencing guidelines range, followed by a life term of supervised release.

## ARGUMENT

### I.   Guidelines Objections

#### 1.   Base Offense Level

Barnett argues that the United States Probation Office (USPO) erred in applying the base offense level 30 pursuant to USSG §2G1.3(a)(2).   Barnett is not entitled to relief, because the jury found that she engaged in sex trafficking of a minor under 18 U.S.C. § 1591(a), and the punishment for violating that prong of the statute is located in section 1591(b)(2).   Specifically, Barnett was charged with sex trafficking a person by force, fraud or coercion and sex trafficking a minor, in violation of 18 U.S.C. § 1591(a).   Congress provided the punishment for violating the two prongs of section 1591(a) in section 1591(b).   Section 1591(b)(1) provides that the punishment for an offense under section 1591(a) is not less than 15 years "if the offense was effected by means of force, threats of

force, fraud or coercion…," and section 1591(b)(2) provides that the punishment is not less than 10 years if the person recruited had attained the age of 14 years but not 18 years.   Here, although the government charged both prongs of the statute, the jury returned a special verdict finding that Barnett engaged in sex trafficking of a minor.   Doc. 141.   The victim was 14 years old at the time of the offense, and thus the punishment is set forth in section 1591(b)(2).   Pursuant to USSG §2G1.3(a)(2), the base offense level for a defendant convicted under 18 U.S.C. § 1591(b)(2) is 30.   Accordingly, the USPO properly applied the base offense level under USSG §2G31.3(a)(2).

2.     Undue Influence Adjustment

Barnett next objects to the two-level enhancement under USSG §2G1.3(b)(2)(B), arguing that she did not unduly influence G.E. to engaged in prohibited sexual conduct.   Barnett is not entitled to relief because her influence over G.E. compromised the voluntariness of G.E.'s behavior.

Section 2G1.3(b)(2)(B) directs a district court to enhance a defendant's offense level by two if she "unduly influenced a minor to engage in prohibited sexual conduct."   The commentary states that, in determining whether the enhancement applies, the district court "should closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior.   The voluntariness of the minor's behavior may be compromised without prohibited sexual conduct occurring."   USSG §2G1.3, comment. (n.3(B)).   Appropriate considerations in determining

whether Barnett influenced G.E. are her superior knowledge, persuasive powers, and superior resources, and their effect on the voluntariness of G.E.'s behavior. *United States v. Root*, 296 F.3d 1222, 1233-34 (11th Cir. 2002)(in determining whether sufficient evidence supported the district court's finding of undue influence, the Eleventh Circuit "look[ed] to facts related to the three types of power the Sentencing Commission stated sex offenders frequently use to manipulate minors," *id.*, at 1235, *i.e.*, "superior knowledge, influence and resources," *id.* at 1234.   Additional considerations are whether Barnett used "coercion, enticement, or other forms of undue influence … [that would] increase [] [her] culpability for the crime."   *See* USSG App C, vol. II, amend. 592, comment.   All of those considerations favor the enhancement.

Barnett exercised undue influence over G.E. by gaining her trust and preying on her vulnerabilities as a troubled runaway.   Barnett groomed G.E. for prostitution by acting as a mother-figure to G.E., bringing G.E. into her adult world, providing her clothing, food and drugs, and teaching her how to "talk game" with men.   Barnett introduced G.E. to the drug molly, and taught her how to be a prostitute.   She took G.E. to hotels to have sex with men, and she took G.E. to the studio for prostitution.   Barnett taught G.E. how to pose seductively for pictures that were used for prostitution and she persuaded G.E. to return to the studio, knowing that G.E. left because she was being abused.   Barnett's influence over G.E. was so powerful, that G.E. protected Barnett by giving investigators a false phone number for Barnett so that they could not find her.

Doc. 158 at 41-42, 54-55.   Even during the trial of the case, G.E. continued to protect Barnett.   Thus the record supports a finding that Barnett's activities compromised the voluntariness of G.E.'s behavior.   *United States v. Jones,* 546 Fed.Appx.946, 947-48 (11th Cir. 2013) (unpublished) (defendant exercised undue influence over minor by purchasing products for her, convincing her he loved her, controlling her prostitution activities, and beating her, despite that the minor had been previously involved in prostitution).

      3.    <u>Use of Computer Adjustment</u>

Barnett also argues that Probation erred in applying the two-level enhancement based on her use of a computer to entice, encourage, or solicit persons to engage in prohibited sexual conduct with G.E., as well as to entice, encourage or facilitate the travel of G.E. to engage in prohibited sexual conduct. Barnett is incorrect.

Subsection 2G1.3(b)(3) directs a district to enhance a defendant's offense level by two if the offense "involved the use of a computer or an interactive computer services to (A) persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct or; (B) entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor[.] The evident purpose of that enhancement is to address that computers facilitate sex crimes against minors by either allowing defendants covert access to minors (subsection (A)) or by allowing defendants to find persons interested in engaging in sex crimes with minors (subsection (B)).

In this case, USPO did not err in applying that enhancement because both subsection (A) and (B) apply.   Barnett and Romby posted computer classified advertisements on the Internet sites myredbook and datehookup to entice, encourage and solicit persons to engage in prohibited sexual conduct with G.E. Romby used his cell phone and computer to arrange for "dates" for G.E.   In addition, Barnett used her cell phone to persuade and entice G.E. to return to the studio, and Carmona and Romby sent Facebook messages to G.E. for the same purpose.   The use of a cell phone to place calls, send text messages, and access the Internet in furtherance of the commission of the offense constitutes the use of a computer.   *See United States v. Mathis*, 767 F.3d 1264, 1283 (11th Cir. 2014) (A computer is a cell phone within the meaning of 18 U.S.C. § 1030(e)(1)). Accordingly, USPO properly applied this specific offense characteristic.

      4.    Commission of a Sex Act Adjustment

Barnett also objects to the two level upward adjustment because the offense involved the commission of a sex act or sexual contact, arguing that she did not have sexual contact with the minor victim.   However, the evidence at trial established that Barnett knew or should have known that G.E. was made to engage in sex acts and the adjustment is proper.

Section 2G1.3(b)(4) provides for a two level upward adjustment if the "offense involved the commission of a sex act or sexual contact."   USSG §2G1.3(b)(4)   In this case, the evidence established that Barnett took G.E. to hotels to have sex with men to groom her for prostitution and took her to the

Knights Inn to have sex with Romby and Carmona to prime her for prostitution. Not only did Barnett know that G.E. was engaged in sex acts, it was also reasonably foreseeable to her.   Thus, the application of the guideline is proper in this case.

       5.   <u>Physical Restraint Adjustment</u>

Barnett argues that the USPO erred in increasing her offense level by two pursuant to USSG §3A1.3 because G.E. was physically restrained in the course of the offense.

Section 3A1.3 instructs a district court to increase a defendant's offense level by two "[i]f a victim was physically restrained in the course of the offense." "'Physically restrained' means the forcible restraint of the victim such as being tied, bound, or locked up."   USSG §3A1.3, comment. (n.1) (cross-referencing USSG §1B1.1, comment. (n.(1)(K))).   The use of "such as" means that the illustrations are examples and not limitations.   *United States v. Jones,* 32 F.3d 1512, 1518 (11th Cir. 1994).   If the restraint was "sufficiently egregious, an upward departure may be warranted."   USSG §3A1.3, comment. (n.3).

Probation correctly applied USSG §3A1.3, because Villanueva had physically restrained G.E. in the course of committing the sex trafficking offense. G.E. testified that Villanueva had three females, one of them armed with a firearm, hold her hostage in the bathroom at Valencia when he left the house. Doc. 157 at 58-64.   Villanueva wanted to make sure that G.E. would not leave

the Valencia house in his absence.  *Id.*  G.E. was only allowed to come out of the bathroom in order to meet with prostitution customers and perform sexual favors.  *Id.*  G.E. felt terrified and believed she was not free to go home.  *Id.* The fact that G.E. was eventually able to leave the house is of no consequence. It does not rebut the fact that G.E. was temporarily restraint to further the goals of the conspiracy.  *See United States v. Vallejo*, 297 F.3d 1154, 1167 (11th Cir. 2002) ("The fact that the victims were eventually free to leave does not mean that they were not physically restrained."); *United States v. Townsend*, 521 Fed. Appx. 904, 909 (11th Cir. 2013) ("We have held that the definition of 'physically restrained' in § 1B 1.1 includes the scenario where victims were held against their will, were left with no alternative but to comply with the defendant, and had no effective way of leaving.").

As a co-conspirator, Barnett is responsible for reasonably foreseeable conduct undertaken by others to further the objectives of the conspiracy.  USSG §1B1.3(a)(1)(B).  Barnett could have foreseen that Villanueva and others would physically restrain G.E. to prevent her from leaving the house.  G.E. had gone home twice and both times the co-conspirators, including Barnett, lured her back in order to continue to use her as a prostitute.  Moreover, Barnett knew that G.E. had no phone, no driver's license, and was relocated to unfamiliar surroundings, thus having no effective was of leaving.  Thus, Barnett should be held accountable for Villanueva's action of physically restraining the victim in

furtherance of the conspiracy.   The enhancement for physical restraint was properly applied.

　　　6.　　Vulnerable Victim under USSG §3A1.1(b)(1)

Barnett also contends that the USPO erred in applying a two level enhancement for vulnerable victim, arguing that the adjustment should not apply because the victim's age was incorporated into the offense guidelines.   The adjustment applies, however, because in addition to her age, the victim's mental state and drug addiction made her particularly susceptible to the criminal conduct.

Section 3A1.1(b) instructs district courts to adjust the total offense level by two levels if "the defendant knew or should have known that a victim of the offense was a vulnerable victim."   USSG §3A1.1(b)(1).   The commentary to USSG §3A1.1(b)(1) states that a "vulnerable victim" is "a person "(A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."    USSG §3A1.1, comment. (n.2). Courts have applied the vulnerable victim enhancement when the victim came from a troubled family, struggled financially, was homeless, and/or given drugs to fuel her addiction.   *See, e.g. United States v. Monslave,* 342 Fed. Appx. 451, 457-58 (11th Cir. 2009)(victims' lack of jobs or income for basic necessities);

*United States v. Amedo*, 370 F.3d 1305, 1317-18 (11th Cir. 2004)(defendants gave drugs to victim with drug addiction); *United States v. Royal*, 442 Fed. Appx. 794, 797-98 (4th Cir. 2011)(minors came from dysfunctional families and were supplied with alcohol and drugs while prostituting for the defendant); *United States v. Evans*, 285 F.3d 664, 672-73 (8th Cir. 2002)(minor victim was a runaway).

Here, Barnett knew that the victim was particularly susceptible to the criminal conduct because of her mental state and drug addictions.   Barnett knew that GE was a runaway and truant, who had a difficult home life and who had tried to kill herself on several occasions.   She also knew that G.E. was a drug abuser and in need of affection.   Barnett took advantage of those vulnerabilities to recruit G.E. into prostitution.   Barnett gained G.E.'s trust, gave G.E. her first molly, took her to hotels to have sex with men in exchange for drugs, alcohol and money and ultimately took her to the studio and Knights Inn for prostitution. Accordingly, the adjustment is proper.

7.     Role Adjustment under USSG §3B1.1(c)

Barnett also objects to the two-level enhancement for her role in the offense, arguing that she was not an organizer, leader, manager or supervisor in the conspiracy.

Section 3B1.1(c) provides that "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity," increase by two levels.   The enhancement is also appropriate "in the case of a defendant who did not

organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." USSG §3B1.1 at comment. n.2.   "[T]he assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement."   *United States v. Jiminez,* 224 F.3d 1243, 1251 (11th Cir.2000).

Here, Barnett used her control and influence over G.E. to recruit G.E. into prostitution.   She primed G.E. for prostitution by teaching her how to "talk game" with customers, and then took her to the studio where she enlisted the help of Romby and Carmona to prostitute G.E.   Barnett posed G.E. for pictures, wrote the internet advertisement for myredbook, took her to the Knights Inn for prostitution, and then persuaded G.E. to return to the studio where G.E. was prostituted by Villanueva.   Barnett was not only a supervisor in the criminal activity, she was also the catalyst for the crime.   Accordingly, the role adjustment is appropriate.

## II.     Section 3553(a) Factors

### 1.     Nature and Circumstances of the Offense

The nature, circumstances and extent of Barnett's criminal conduct is egregious and militates in favor of a guidelines sentence.   *See* 18 U.S.C. § 3553(a)(1).   Barnett intentionally targeted G.E. based on her age and vulnerabilities to recruit and involve her in prostitution.   Barnett knew that G.E. was mentally fragile and a runaway in need of affection.   She preyed on these vulnerabilities and handed her over to a gang for prostitution.   Then, after G.E.

left the studio because she was being prostituted and mistreated, Barnett persuaded G.E. to return with false claims that Carmona wanted to see her and false promises that the gang would not mistreat her.   Barnett knew that G.E. craved social acceptance, even if it was acceptance from a gang, and she used that knowledge to lure G.E. back into prostitution.   Barnett was the impetus for the crime; without her, the crime would have never occurred.

"Child sex crimes are among the most egregious and despicable of societal and criminal offenses."   *United States v. Sarras,* 575 F.3d 1191, 1220 (11th Cir. 2009)(court affirmed as reasonable a 100-year-sentence for a first offender who sexually abused a 13-year-old girl and photographed the abuse); *United States v. Mozie*, 752 F.3d 1271, 1289 (11th Cir. 2014) (court affirmed as reasonable a life sentence for an offender who engaged in sex trafficking of children).

Congress and the courts have recognized that Barnett's crime is serious. A guidelines sentence adequately reflects the seriousness of Barnett's offense, and there is nothing about the seriousness of the offense which warrants a variance.   18 U.S.C. § 3553(a)(2)

  2. <u>History and Characteristics of the Defendant</u>

Similarly, Barnett's history and characteristics weigh in favor of a guidelines sentence.   18 U.S.C. § 3553(a)(1).   This factor is aimed at distinguishing among defendants who commit a particular offense or type of offense.   *United States v. Irey,* 612 F.3d 1160, 1203 (11th Cir. 2010).   Here, Barnett lured a 14 year-old girl into prostitution, and Barnett's history and

characteristics do not distinguish her from other defendants who commit child sex trafficking offenses under similar circumstances.

Barnett has a troubling history of neglect and a consistent refusal to abide by the law.   Moreover, although Barnett had a sad upbringing, she chose to repeatedly victimize a child without any regard for the consequences of her behavior.   Her history and characteristics do not warrant a downward variance.

3. Just Punishment, Adequate Deterrence, Respect for the Law, and Protection of the Public

A guidelines sentence also meets the sentencing goals of just punishment, adequate deterrence, respect for the law and protection of the public in this case. Congress has explained that the "just deserts" concept in sentencing is a means of reflecting the "gravity of the defendant's conduct," as well as the "harm done or threatened by the offense."   S. Rep. No. 98-225, at 75-76, 1984 U.S.CC.A.N. 3258-59.   Accordingly, "the greater the harm, the more serious the crime, and the longer the sentence should be for the punishment to fit the crime."   *Irey*, 612 F.3d at 1206.

The sex trafficking crime committed by the defendants in this case is a grave offense that inflicted immeasurable physical, mental and emotional harm on the victim.   During the trial, the victim testified to the fear she felt when she was locked in the bathroom at gunpoint, and the humiliation she suffered when forced to perform commercial sex acts with members of the gang and customers.   She testified to the lasting effects of the crime on her, and to the depression, anxiety and post-traumatic stress that she has suffered as a result of the defendants'

conduct.

In addition, a guidelines sentence will promote respect for the law. Barnett has violated the law repeatedly throughout her life.  Most disturbingly, Barnett encountered difficulties during her childhood similar to the victim's difficulties, yet she chose to exploit and recruit the minor victim in prostitution and cause her grave harm without an apparent appreciation for the consequences of her conduct.  Similarly, this Court should impose a severe sentence that will serve as a warning to individuals considering similar conduct.   "The more serious the crime and the greater the defendant's role in it, the more important it is to send a strong and clear message that will deter others."   *Irey*, 612 F.3d at 1212.

Finally, Barnett has demonstrated that she is a danger to children.   Her criminal conduct and lack of remorse demonstrate that she is prone to recidivism and lacks respect for the law.

For the foregoing reasons, the United States respectfully requests the Court to sentence Barnett to a guidelines prison sentence followed by a life term of supervised release.   In light of the serious nature of the offense, Barnett's

personal characteristics, the need for the protection of children, just punishment, deterrence, and the need to promote respect for the law, a guidelines sentence reasonable.

Respectfully submitted,

A. LEE BENTLEY, III
United States Attorney

By:     *s/ Ilianys Rivera Miranda*
ILIANYS RIVERA MIRANDA
Assistant United States Attorney
USA No. 150
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone:      (407) 648-7500
Facsimile:       (407) 648-7643
E-Mail:            Ilianys.rivera@usdoj.gov

*s/ Karen L. Gable*
KAREN L. GABLE
Assistant United States Attorney
USA No. 025
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone:   (407) 648-7500
Facsimile:    (407) 648-7643
E-mail:         karen.gable@usdoj.gov

**U.S. v. XAVIER FRANCISCO VILLANUEVA, ET AL.**          **Case No. 6:14-cr-96-Orl-22-GJK**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2014, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice

of electronic filing to the following:

Ernesto L. Luna
Counsel for Xavier Francisco Villanueva

Craig S. Forrester
Counsel for Keith E. Romby, II

Ernest L. Chang
Counsel for Jose Carmona

Fritz J. Scheller and Lydia Pittaway
Counsel for Ashley Nicole Barnett

<u>s/ Ilianys Rivera Miranda</u>
ILIANYS RI MIRANDA
Assistant United States Attorney
USA No. 150
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone:   (407) 648-7500
Facsimile:    (407) 648-7643
E-mail:        ilianys.rivera@usdoj.gov